IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| JOHN ANDERSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 2:08-CV-165 |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| Commissioner of Social Security, | § | |
| | § | |
| Defendant. | § | |

**REPORT AND RECOMMENDATION
TO REVERSE THE COMMISSIONER'S DECISION
AND REMAND FOR FURTHER ADMINISTRATIVE ACTION**

Plaintiff JOHN ANDERSON brings this cause of action pursuant to 42 U.S.C. § 405(g), seeking review of a final decision of defendant MICHAEL J. ASTRUE, Commissioner of Social Security (Commissioner), denying plaintiff's application for supplemental security income (SSI). Both parties have filed briefs in this cause. For the reasons hereinafter expressed, the undersigned United States Magistrate Judge recommends the Commissioner's decision finding plaintiff not disabled and not entitled to benefits be REVERSED and the case REMANDED for further administrative proceedings.

I.
RECORD

A. Medical History

Plaintiff's medical records indicate plaintiff suffers from a long history of mental illness. The medical records start in 1998, while petitioner was incarcerated in the Montford Psychiatric Unit of the Texas Department of Criminal Justice (TDCJ). (Transcript [hereinafter Tr.], pgs. 187-93,

449). Those records indicate a prison psychiatrist diagnosed plaintiff as having Major Depressive Disorder, Polysubstance Dependence, Social Phobia, Antisocial Personality Disorder, and Borderline Personality Disorder. (*Id.*, pg. 197). Plaintiff's Global Assessment of Functioning (GAF) score was 65 on June 1, 1998 and 55 on June 24, 1998 (*Id.*, pgs. 197, 202).

The next TDCJ medical records, from early 2001, indicate plaintiff voiced passive suicidal ideation. (*Id.*, pg. 167). Less than a month after the report, plaintiff was placed on suicide precaution, and not long thereafter attempted to commit suicide. (*Id.*, pgs. 161, 163). After attempting suicide, a doctor's report indicated plaintiff had "been hearing voices but denies hearing the voices at this time." (*Id.*, pg. 163). Plaintiff's GAF score was 30. (*Id.*, pg. 168). The doctor diagnosed plaintiff as bipolar, "severe with psychosis." (*Id.*). Plaintiff was released from TDCJ custody in October 2001. (*Id.*, pg. 241).

In January 2003, plaintiff was admitted to a psychiatric hospital. (*Id.*, pg. 241). At the time he was admitted, plaintiff was delusional, paranoid, and "hearing voices from the Devil." (*Id.*). He had a GAF score of 30. (*Id.*, pg. 242). A doctor diagnosed plaintiff with "Schizo-Affective Disorder, bipolar type." (*Id.*, pg. 242). He was put on medications and released from the hospital in February 2003. (*Id.*, pgs. 241-42).

In May 2003, plaintiff was examined by a Dr. Mizell for the purpose of determining SSI disability. (*Id.*, pg. 254). Dr. Mizell's report indicates plaintiff said he had experienced both auditory and visual hallucinations along with racing thoughts, paranoia, delusions, depression, and mania. (*Id.*). The doctor indicated plaintiff had "Schizoaffective Disorder, bipolar type, in remission," and "antisocial personality disorder." (*Id.*, pg. 256). Plaintiff's GAF score at the time was 45. (*Id.*, pg. 256). Dr. Mizell also indicated plaintiff's condition improved with medication

and plaintiff was able to work while his disease was in remission. (*Id.*). Also in May 2003, Dr. Robert Gilliland, another state agency physician, performed a Mental Capacity Assessment and a Psychiatric Review on plaintiff. The doctor determined plaintiff was able to work, indicating "[Mr. Anderson] says he is able to work." (*Id.*, pg. 260).

Approximately one month later, in June 2003, plaintiff was again hospitalized at a psychiatric hospital. (*Id.*, pg. 410). At the time of admission, plaintiff's GAF score was 15. (*Id.*, pg. 413). Plaintiff was uncooperative and had "profound psychomotor retardation." (*Id.*). The doctor at the hospital "suspect[ed] patient is experiencing auditory hallucinations and delusions." (*Id.*). After receiving psychiatric medications, plaintiff's mental condition stabilized. (*Id.*, pg. 410). He indicated he was hearing voices but was "paying less attention to them." (*Id.*, pg. 411). Plaintiff was released from the hospital in July 2003 with a GAF score of 40. (*Id.*, pg. 410). He indicated his intent to stay on the prescribed psychiatric medications. (*Id.*, pg. 411).

In January 2004, plaintiff was treated at an emergency room for "hearing voices," "seeing things," and "feeling unstable." (*Id.*, pg. 419). The doctor's notes indicated plaintiff told the doctor he "had been incarcerated until this week." (*Id.*, pg. 421). Plaintiff told the doctor he had not been taking his medications "for some time," but that he was willing "to give medications a try." (*Id.*, pgs. 421-22). Plaintiff was diagnosed with schizoaffective disorder and polysubstance abuse. (*Id.*, pg. 424). Plaintiff was released with five days of medications and instructions to contact a local mental health clinic. (*Id.*, pg. 425).

It appears plaintiff attended the recommended outpatient services program from late January 2004 through May 2004. (*Id.*, pgs. 355-79). During that time, plaintiff reported his condition improved with medication. (*Id.*, pg. 359, 378). His auditory hallucinations significantly decreased

in frequency and intensity. (*Id.*, pgs. 355-56, 363-66). He reported no visual hallucinations. (*Id.*, pg. 365). In late May 2004, plaintiff was again seen by the outpatient program and reported the "voices are few and far between" and the "hallucinations are less intrusive." (*Id.*, pgs. 355-56). May 27, 2004 is the last entry from the outpatient program in 2004. On May 28, 2004, a Dr. Reddy evaluated plaintiff for SSI purposes and indicated he had schizoaffective disorder, but that he was responding well to treatment. (*Id.*, pg. 281).

At some unknown time after May 2004, plaintiff moved to New Mexico. While in New Mexico, plaintiff stopped taking his medications. (*Id.*, pg. 348). Two months later, he developed worsening psychosis and was rehospitalized. (*Id.*). At some later point, but also in 2004, plaintiff was incarcerated in the New Mexico Corrections Department (NMCD). (*Id.*, pgs. 351, 427).

It is unclear whether plaintiff was taking his medications at the time he became incarcerated, but in mid-November 2004, while incarcerated, he stopped taking his medications. (*Id.*, pg. 432). A week later, he was reported as suicidal, combative, and a danger to himself and others. (*Id.*, pg. 434). He was transferred to a the mental health services unit of NMCD. (*Id.*, pgs. 432-34). Upon transfer, plaintiff was displaying behavior such as smearing the wall of his cell with feces, urinating on himself, and refusing to speak with anyone. (*Id.*, pg. 432). His GAF score was 20. (*Id.*, pg. 433). Plaintiff again reported hearing voices. (*Id.*, pg. 428). NMCD administered intravenous psychiatric medication. (*Id.*). Plaintiff then agreed to begin taking medication and a short time later "discussed how much better he feels taking his medications . . . he still hears voices but they are not as loud." (*Id.*, pg. 427). By the end of December 2004, plaintiff was classified as "stable." (*Id.*, pg. 426).

Apparently plaintiff was released by NMCD and moved back to Texas either in late April or early May 2005. (*Id.*, pg. 353). On May 3, 2005, plaintiff called the Texas Panhandle MHMR,

saying he needed a refill for his psychiatric medications. (*Id.*). During that call, plaintiff "report[ed] he does experience auditory features including 'voices that play games with me. They disguise themselves as family or my ex-wife. Sometimes it is the Devil.'" (*Id.*). He reported having had visual hallucinations but denied having experienced any such hallucinations in recent history. (*Id.*). At the in-person visit following that call, Dr. Matthew Houseal indicated plaintiff had schizophrenia and antisocial personality disorder. (*Id.*, pg. 347). At that visit, plaintiff's GAF was 55. (*Id.*). In July 2005, Dr. Houseal indicated plaintiff displayed no psychotic symptoms. (*Id.*, pg. 345). By August 2005, plaintiff was considered stable, having made significant progress since May. (*Id.*, pg. 344). Petitioner appears to have remained stable throughout the remainder of 2005. (*Id.*, pgs. 336-39). Also in August 2005, Dr. Lankford Charles evaluated plaintiff for SSI purposes. Dr. Charles indicated plaintiff had schizophrenia, bipolar disorder, "anti social behavior," and a history of substance abuse. (*Id.*, pgs. 297, 298, 302, 303).

Throughout 2006, plaintiff displayed either no or minimal psychotic symptoms with a GAF score of 55. (*Id.*, pgs. 326-33). In 2007, plaintiff continued to respond well to medication although he indicated he infrequently still heard voices. (*Id.*, pgs. 325, 444). His GAF score remained 55. (*Id.*, pg. 443). The transcript before the Court contains no medical records past May 2007.

### B. Procedural History of SSI Claim

In June 2005, plaintiff applied for SSI disability benefits. (Tr., pgs. 12, 458). In his application, plaintiff alleged he had been unable to work since August 5, 2004. (*Id.*, pg. 12). The Social Security Administration denied benefits initially and upon reconsideration. On July 30, 2007, a hearing on plaintiff's claim was held before an Administrative Law Judge (ALJ). (*Id.*, pg. 445). Plaintiff was not represented by an attorney at the hearing but was represented by an advocate. (*Id.*,

pg. 447). In November 2007, the ALJ issued a Decision finding plaintiff not disabled at Step Five of the five-step sequential analysis and not entitled to benefits at any time relevant to the decision. (*Id.*, pg. 22). The ALJ found plaintiff "has the following severe impairment[s]: Schizophrenia, paranoia, antisocial personality disorder and history of substance abuse," all of which caused "significant limitations in the claimant's ability to perform basic work activities." (*Id.*, pg. 14). The ALJ, purportedly relying upon the opinions of State agency physicians, "concluded that the claimant's impairments neither met nor equaled the severity of any listed impairment." (*Id.*). The ALJ then found "the claimant has the residual functional capacity to perform medium unskilled work requiring only repetitive simple tasks due to loss of sharp cognition and short term memory." (*Id.*, pg. 17).

Plaintiff's past relevant work was as a "cook, delivery person, line server, farm worker and trailer mechanic." (*Id.*, pg. 20). The ALJ determined plaintiff was unable to perform this past relevant work. (*Id.*). Instead, relying on the testimony of the Vocational Expert (VE), the ALJ concluded plaintiff could perform work as a "farm worker . . . delivery driver . . .and kitchen helper." (*Id.*, pg. 21). Having found at Step Five that other work plaintiff could perform exists in significant numbers in the national economy, the ALJ concluded a finding of "not disabled" was appropriate. (*Id.*, pg. 22). Plaintiff appealed the Decision. (*Id.*, pg. 8). The Decision was affirmed on appeal. (*Id.*, pg. 5). This federal lawsuit followed.

## II.
## STANDARD OF REVIEW

In reviewing disability determinations by the Commissioner, this Court's role is limited to determining whether substantial evidence exists in the record, considered as a whole, to support the Commissioner's factual findings and whether any errors of law were made. *Anderson v. Sullivan*,

887 F.2d 630, 633 (5th Cir. 1989). If the Commissioner's findings are supported by substantial evidence, they are conclusive, and the reviewing court may not substitute its own judgment for that of the Commissioner, even if the court determines the evidence preponderates toward a different finding. *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980). Conflicts in the evidence are to be resolved by the Commissioner, not the courts. *Laffoon v. Califano*, 558 F.2d 253, 254 (5th Cir. 1977). The level of review this Court applies is not *de novo*. The fact that the ALJ *could* have found plaintiff to be disabled is not the issue. The ALJ did not do this, and the case comes to federal court with the issue being limited to whether there was substantial evidence to support the ALJ's Decision and whether any errors of law were made.

## III.
## ISSUES PRESENTED

The ALJ made the determination plaintiff is not disabled at Step Five of the five-step sequential analysis. *See* 20 C.F.R. § 404.1520(a)(4). Therefore, this Court is limited to reviewing only whether there was substantial evidence in the record as a whole supporting a finding that plaintiff retained the ability to perform work that exists in significant numbers in the national economy, and whether the proper legal standards were applied in reaching this decision. To that extent, plaintiff urges, "The Commissioner's decision that Mr. Anderson was not disabled at the fifth step of the sequential process is not supported by substantial evidence." ("Plaintiff's Brief in Support of Claim for Social Security Benefits," filed June 1, 2009, doc. 11, [hereinafter Plaintiff's Brief], pg. 5). According to plaintiff, the VE's testimony was based on an inaccurate hypothetical question posed by the ALJ, who did not sufficiently describe plaintiff's limitations in her questions to the VE.

# IV.
# MERITS

## A. Determining the Sufficiency of a Hypothetical Question

The central contention in this case is that the hypothetical asked of the VE by the ALJ was inadequate. Plaintiff was denied benefits at Step Five of the five-step evaluation process for determining whether a person is disabled. *See* 20 C.F.R. § 404.1520. By the time review reaches Step Five, the ALJ has concluded (i) the claimant is not engaged in substantial gainful activity, (ii) suffers from a severe impairment that (iii) meets certain duration requirements and is a recognized impairment, and (iv) the claimant is unable to perform the work he has done in the past. *Id.* In these first four steps, the burden of proof is on the claimant.

At Step Five, the burden of proof shifts to the Commissioner to identify other substantial gainful employment in significant numbers in the national economy available and which the claimant can engage in and maintain for a significant period of time. *Watson v. Barnhart*, 288 F.3d 212, 217 (5th Cir. 2002); *Anderson v. Sullivan*, 887 F.2d 630, 632 (5th Cir. 1989). To meet the burden of proof, an ALJ may rely on the testimony of a VE. *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994). If the ALJ chooses to rely upon a VE's testimony, the testimony must be relevant, i.e. related to the claimant's abilities and background. The VE's answer to a sufficient hypothetical question can provide substantial evidence supporting a denial of benefits. *Id.* However, "a determination of non-disability based on . . . a defective question cannot stand." *Id.*; *See Newton v. Chater*, 92 F.2d 688, 694-95 (8th Cir. 1996) (stating "[a] hypothetical question must precisely describe a claimant's impairments so that the vocational expert may accurately assess whether jobs exist for the claimant"). The Fifth Circuit has established a hypothetical will not produce reversible error if the question "incorporate[s] reasonably all disabilities of the claimant recognized by the ALJ"

and the claimant or his representative was given the opportunity to correct deficiencies in the ALJ's question. *Bowling*, 36 F.3d at 436. Court's have held that a claimant's opportunity at the hearing to correct any deficiencies in the ALJ's hypothetical question during cross-examination does not automatically salvage an ALJ's reliance on that question. *See Guillen v. Atrue*, 584 F. Supp. 2d 930, 940 (W.D. Tex. 2008); *Ellis v. Astrue*, No. 7:09-CV-70, 2010 WL 3422872 at *5 (N.D. Tex. July 27, 2010).

### B. The Hypothetical Question in Plaintiff's Case

At the July 2007 hearing, the ALJ asked the VE the following hypothetical:

> I want you to assume an individual who has no serious exertional limitations. In fact, is capable of, of doing probably medium to heavy work and anything else less than that. This individual has a GED and went on to vocational school to learn diesel mechanics and worked as a mechanic. This individual would have the same work history as the claimant and education and no significant physical limitations. *The main non exertional limitations would be a loss of sharp cognition, also a loss of short-term memory but could probably still do unskilled work requiring only repetitive, simple tasks.* Are there jobs that exist in significant numbers in the national economy that such a person could do?

(Tr., pg. 460) (emphasis added). According to plaintiff, the italicized portion of the question was an inadequate description of plaintiff's recognized limitations.

As detailed above, plaintiff's medical records demonstrated almost ten years of continued and serious mental health problems. The ALJ concluded plaintiff "has the following severe impairment: [sic] Schizophrenia, paranoia, antisocial personality disorder and history of substance abuse." (Tr. 14). In the hypothetical question posed to the VE, however, the ALJ reduced the problems stemming from these disorders to a loss of sharp cognition and of short-term memory. Plaintiff contends this description was inadequate because it failed to convey the full extent of his limitations.

C. Was the Residual Functional Capacity Determination Accurate

The hypothetical posed to the VE by the ALJ was based verbatim on the ALJ's determination of plaintiff's residual functional capacity (RFC). (Tr. 17). The question in this case, therefore, is not whether the ALJ adequately incorporated the RFC determination into the hypothetical. Rather, the question is whether the language of the RFC determination itself, upon which the hypothetical was based, accurately incorporated all of plaintiff's work-related limitations. At the third step of review, if the ALJ finds a claimant's mental impairment is "severe," the ALJ must then determine if it meets or equals a listed mental disorder under 20 C.F.R. Pt. 404, Subpt. P, app. 1, 12.00-12.09 and 20 C.F.R. § 404.1520a(c)(2). If the impairment is severe but does not reach the level of a listed disorder, then the ALJ must conduct an RFC assessment. *Boyd v. Apfel*, 239 F.3d 698, 705 (5th Cir. 2001). In making the RFC assessment and in determining the limitations imposed by a claimant's impairments, the ALJ is instructed to consider the entire record. Social Security Ruling 96-6p, 1996 WL 374184 at * 2 (July 2, 1996).

> RFC is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis, and the RFC assessment must include a discussion of the individual's ability on that basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule. RFC does not represent the *least* an individual can do despite his or her limitations or restrictions, but the *most*.

*Id.* (emphasis in original).

Dr. Gilliland, who examined plaintiff in 2003, indicated plaintiff had moderate limitations in his ability to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, interact appropriately with the general public, and maintain social functioning. (Tr., pgs. 258-59, 272). Dr. Reddy, who examined plaintiff in 2004, opined plaintiff was markedly limited in his ability to understand, remember, and carry out detailed

instructions. (Tr., pg. 277). The same doctor also indicated plaintiff was moderately limited in his ability to complete a normal workday and workweek without interruptions, perform at a consistent pace, and respond appropriately to changes in a workplace setting. (*Id.*, pg. 278). Finally, Dr. Charles, who examined plaintiff in 2005, indicated plaintiff was moderately limited in his ability to understand, remember, and carry out detailed instructions, and maintain attention and concentration for extended periods. (Tr., pg. 309). The doctor indicated plaintiff was moderately limited in his ability to complete a normal workday and workweek, accept instructions and respond appropriately to criticism from supervisors, respond appropriately to changes in the work setting, and set realistic goals or make plans independently of others. (*Id.*, pg. 310).

At the hearing, plaintiff's history of paranoia and schizophrenia, along with the fact that he was still hearing voices, were discussed. (Tr., pgs. 449-51). The limitations indicated by the social security doctors, i.e. that plaintiff was moderately limited in his ability to complete a normal workday and work week, were not discussed. During his testimony, the VE was not asked to reference a person with a history of paranoia or schizophrenia or one demonstrating the limitations discussed by the social security doctors. He was simply asked to consider whether a person with no serious exertional limitations and non-exertional limitations of short-term memory loss and loss of sharp cognition could perform unskilled jobs existing in significant numbers in the national economy.

In the Decision, the ALJ indicates she relied upon the opinions of the social security physicians in making her determination. (Tr., pg. 14). The ALJ fails, however, to discuss two of the doctors' findings that plaintiff was moderately limited in his ability to complete a normal workday and workweek. In fact, the ALJ never addresses any of the marked or moderate limitations indicated by the doctors. The Government, in its brief to this Court, contends that the overall

positions of the Commissioner's medical consultants were consistent with the ALJ's Decision. This argument fails to address the specific notations by two of the three agency doctors that plaintiff's ability to complete a normal workday and workweek was moderately limited. (Tr., pgs. 259, 278, 310). The ALJ's Decision contains no explicit discussion of the medical consultants' opinions, which is contrary to Social Security Administration policy. *See* Social Security Ruling 96-6p, 1996 WL 374180 at *2 (July 2, 1996) (establishing "[a]dministrative law judges . . . are not bound by findings made by State agency or other program physicians and psychologists, but they may not ignore these opinions and must explain the weight given to the opinions in their decisions").

Of special import are the opinions of Dr. Reddy and Dr. Charles. Dr. Reddy evaluated plaintiff on May 28, 2004. At that time, plaintiff had been participating in an outpatient program for five months. (Tr., pgs. 355-79). During that time, he was compliant with taking his prescribed medications. (Tr., pgs. 359, 378). Despite the fact he was properly medicated and responding well to treatment, Dr. Reddy opined that plaintiff was moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms. (Tr., pg. 278). Dr. Reddy additionally stated plaintiff was moderately limited in his ability to respond appropriately to changes in the work setting and interact appropriately with the general public. (Tr., pg. 278).

Additionally, Dr. Charles examined plaintiff in August 2005, *after* plaintiff had been on medications for three months. On August 9, 2005, a counselor at the outpatient services program attended by plaintiff indicated plaintiff was stable, having made considerable progress since starting the program in May 2005. (Tr., pg. 344). On August 17, 2005, Dr. Charles indicated plaintiff was moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms. (Tr., pg. 310). Dr. Charles additionally indicated plaintiff

was moderately limited in his ability to accept instructions and respond to criticism from supervisors, respond appropriately to changes in the work setting, and set realistic goals or make plans independently of others. (Tr., pg. 310).

Therefore, medical evidence indicated plaintiff may have difficulty working a normal workday or workweek due to his psychological conditions despite being stabilized by medications. To the extent the ALJ relied upon the state agency physicians in making the Decision, the ALJ only relied upon the parts of the doctors' opinions suggesting plaintiff can work. The ALJ failed to at all discuss the medical evidence indicating plaintiff's limitations on his ability to work or otherwise indicate why those opinions were not incorporated into the RFC determination, upon which the hypothetical posed to the VE was based.

It is true the ALJ need not have incorporated into the hypothetical limitations that she found unsupported in the record. *See Morris v. Bowen*, 864 F.2d 333, 336 (5th Cir. 1988). Additionally, the ALJ need not have incorporated into the RFC or hypothetical the word-for-word limitations of plaintiff's mental impairments. The difficulty in this case, however, is that there is no discussion whatsoever of why the ALJ disregarded the medical records indicating plaintiff was limited in his ability to complete a normal workday or workweek, even when he was properly medicated. Since plaintiff's limitations were not included in the hypothetical, and no reason was given for the ALJ's disregard of the limitations, the VE did not base his opinion on the full extent of plaintiff's limitations, and his testimony could not have constituted substantial evidence to support the Commissioner's decision. *See Bowling*, 36 F.3d at 436.

The insufficiency of the hypothetical is highlighted by the conflict between the VE's testimony and the ALJ's Decision. The VE testified the person described in the ALJ's hypothetical could perform work as a farm worker, delivery driver, and kitchen helper. (Tr., pg. 460-61). The

ALJ, however, found at Step Four that plaintiff could not perform his past relevant work as "cook, delivery person, line server, farm worker and trailer mechanic." (Tr., pg. 20). The VE's testimony that plaintiff could perform work as a farm worker was a direct contradiction to the ALJ's determination plaintiff *could not* perform work as a farm worker. The VE's testimony that plaintiff could perform work as a delivery person and kitchen helper also is suspect in comparison to the ALJ's determination plaintiff *could not* perform work as a delivery driver or cook.[1] The VE's testimony in comparison to the ALJ' determination reinforces the determination that the hypothetical was flawed. When the hypothetical permits the VE to testify that the hypothetical person can perform specific jobs the ALJ has already determined the plaintiff cannot perform, then either the hypothetical or the Step Four determination is flawed.

Moreover, as the ALJ recognized in the Decision, plaintiff has a history of non-compliance with his medications. None of the state agency physicians, or any of the other doctors plaintiff saw, provided their opinion as to why plaintiff became non-complaint after his conditions had improved with medications. Likewise, the ALJ's Decision contains nothing indicating the reasons for plaintiff's noncompliance. The undisputed evidence shows, however, that plaintiff suffers from severe mental illness, experiences auditory hallucinations when medicated and auditory and visual hallucinations when not medicated, and has an extended history of cycling in and out of compliance with prescribed treatment plans. "[F]ederal courts have recognized that a mentally ill person's noncompliance with psychiatric medications could be the 'result of [the] mental impairment and, therefore, neither willful nor without a justifiable excuse.'" *Grossweiler v. Barnhart*, No. SA-02-

---

[1] The VE's testimony that plaintiff could work as a delivery person is also called into doubt by Dr. Reddy's statement, unaddressed by the ALJ, that plaintiff would have moderate limitations in interacting with the general public. *See Dictionary of Occupational Titles*, Code # 57311A, "Couriers and Messengers" (indicating the various ways in which interaction with persons outside the organization is one of the most important and main elements in being a courier or messenger).

CA-903-RF, 2003 WL 22454928 at *2 (W.D. Tex. Sept. 30, 2003) (citing *Mendez v. Chater*, 943 F.Supp. 503, 508 (E.D. Pa. 1996)); *see Burns v. Astrue*, No. 5:07-CV-182, 2008 WL 2191303 (N.D. Tex. May 27, 2008); *Brashears v. Apfel*, 73 F.Supp.2d 648 (W.D. La. 1999). Despite plaintiff's history, there is no discussion of the possibility that plaintiff may, as a result of his mental illness, stop taking his medications or implications of such noncompliance in relation to his ability to work on a regular and continuing basis. *See* Social Security Ruling 96-6p, 1996 WL 374184 at * 2 (July 2, 1996); *Singletary v. Bowen*, 798 F.2d 818, 821 (5th Cir. 1986) (holding that in cases where a claimant has a mental illness, the ALJ must determine plaintiff is able to not only engage in substantial gainful activity but is able to hold whatever job he finds for a significant period of time).

In sum, the ALJ described a schizophrenic, paranoid person, experiencing auditory hallucinations when medicated and auditory and visual hallucinations when not medicated, who had antisocial personality disorder and a history of substance abuse and noncompliance with treatment plans as having the disability of a loss of short-term memory and loss of sharp cognition. Such a description did not reasonably incorporate all the disabilities plaintiff suffers from as recognized by the ALJ and the state agency physicians. *See Bowling*, 36F.3d at 436. Consequently, there is not substantial evidence supporting the Commissioner's determination. *See id.* Having failed to meet the burden of proof at Step Five of the process determining disability, plaintiff's case must be returned to the Commissioner for further development of plaintiff's ability to obtain and maintain employment at a job that exists in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520.

V.
RECOMMENDATION

For all of the reasons set forth above, it is the opinion and recommendation of the

undersigned to the United States District Judge that the decision of the Commissioner finding plaintiff not disabled and not entitled to disability benefits be REVERSED and the case be REMANDED.

## VI.
## INSTRUCTIONS FOR SERVICE

The United States District Clerk is directed to send a copy of this Report and Recommendation to each party by the most efficient means available.

IT IS SO RECOMMENDED.

ENTERED this 22nd day of April, 2011.

_____
CLINTON E. AVERITTE
UNITED STATES MAGISTRATE JUDGE

## * NOTICE OF RIGHT TO OBJECT *

Any party may object to these proposed findings, conclusions and recommendation. In the event parties wish to object, they are hereby NOTIFIED that the deadline for filing objections is fourteen (14) days from the date of filing as indicated by the "entered" date directly above the signature line. Service is complete upon mailing, Fed. R. Civ. P. 5(b)(2)(C), or transmission by electronic means, Fed. R. Civ. P. 5(b)(2)(E). **Any objections must be filed on or before the fourteenth (14th) day after this recommendation is filed** as indicated by the "entered" date. *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(2); *see also* Fed. R. Civ. P. 6(d).

Any such objections shall be made in a written pleading entitled "Objections to the Report and Recommendation." Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on all other parties. A party's failure to timely file written objections to the proposed findings, conclusions, and recommendation contained in this report shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by the Magistrate Judge in this report and accepted by the district court. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996); *Rodriguez v. Bowen,* 857 F.2d 275, 276-77 (5th Cir. 1988).